**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

BENJAMIN BRAXTON, also known as Obed-Edom
Braxton,

                                Plaintiff,

v.

KEVIN BRUEN, JEFF MCKOY, JOSEPH BELLNIER,
DANIEL MARTUSCELLO, CARL KOENIGSMANN,
EARL BELL, and MICHAEL KIRKPATRICK,

                                Defendants.

9:17-cv-01346 (BKS/ML)

---

**Appearances:**

*For Plaintiff:*
Victor L. Hou
Pedro Martini
Jillian Moss
Madeline Hundley
Regina Paparo
Caleb Linton
John Samuel
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

*For Defendants:*
Letitia James
Attorney General of the State of New York
Thomas A. Cullen
Assistant Attorney General
The Capitol
Albany, New York 12224

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Benjamin Braxton, also known as Obed-Edom Braxton, brought this 42 U.S.C. § 1983 action stemming from his alleged exposure to excessive environmental tobacco smoke ("ETS") during his incarceration at Clinton Correctional Facility.[1] (Dkt. No. 139). During the relevant time, Defendants Kevin Bruen, Jeff McKoy, Joseph Bellnier, Daniel Martuscello, and Carl Koenigsmann served as deputy commissioners of the New York State Department of Corrections and Community Supervision ("DOCCS"). Defendants Earl Bell and Michael Kirkpatrick served as Clinton superintendents. This case returns on remand from the Second Circuit, which vacated this Court's previous grant of summary judgment. Presently before the Court are Defendants' most recent motion for summary judgment and Plaintiff's motion for sanctions for spoliation of evidence. (Dkt. Nos. 201, 210). The motions are fully briefed, and the Court heard oral argument on March 25, 2026. (Dkt. Nos. 201-2, 211, 212, 224-6, 225-7, 232, 233). For the reasons that follow, Plaintiff's motion is granted in part and denied in part, and Defendants' motion is granted in part and denied in part.

## II.    FACTS[2]

Plaintiff was incarcerated at Clinton between August 2016 and August 2020. (*See* Dkt. No. 201-18, at 1). Throughout this litigation, he has alleged he was exposed to excessive ETS there, from at least 2016 to 2018. (*See* Dkt. No. 139, at 4–9). Bell and Kirkpatrick served as

---

[1] Although Plaintiff has used different pronouns throughout this litigation, Plaintiff's counsel used he/him pronouns to refer to Plaintiff in briefing and at oral argument, so the Court does as well.

[2] The facts, which the Court construes in the light most favorable to Plaintiff as the party opposing summary judgment, are drawn from the parties' exhibits submitted in connection with the motions. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

Clinton superintendents during that time. (Dkt. No. 201-35, ¶ 1; Dkt. No. 201-41, ¶ 1; *see also* Dkt. No. 213-30, at 2). Plaintiff asserts that both knew of excessive exposure to ETS at Clinton. (*See* Dkt. No. 212-1, at 76–77).

The remaining defendants were deputy commissioners working in DOCCS's Albany, New York central office.[3] (Dkt. No. 201-29, ¶ 13; Dkt. No. 201-30, ¶ 12; Dkt. No. 201-31, ¶ 20; Dkt. No. 201-32, ¶ 12; Dkt. No. 201-33, ¶ 12). As deputy commissioners, they also served as members of the Central Office Review Committee ("CORC"). (Dkt. No. 201-22, at 1, 11). The CORC is a group of central office officials convened to hear incarcerated individuals' appeals from facility-level grievance decisions. (*See id.* at 1, 10–11). Plaintiff asserts that, after unsuccessful attempts to resolve his ETS grievances, he wrote letters to each CORC Defendant concerning his exposure to ETS, which they failed to remedy. (*See* Dkt. No. 213-9, at 2–4; *see also* Dkt. Nos. 213-10, 213-11, 213-12, 213-13). Each of these Defendants asserts that he never personally served on the CORC, but instead appointed designees to serve on his behalf. (Dkt. No. 201-29, ¶ 6; Dkt. No. 201-30, ¶ 6; Dkt. No. 201-31, ¶ 11; Dkt. No. 201-32, ¶ 6; Dkt. No. 201-33, ¶ 6).

### A.    DOCCS Smoking Policies

Pursuant to New York's Clean Indoor Air Act, *see* N.Y. Pub. Health Law § 1399-n *et seq.*, DOCCS prohibited indoor smoking in its facilities in 1999. (*See* Dkt. No. 201-23, at 1). Under that policy—fully implemented by 2001—"indoor smoking within all correctional facilities [was to] cease." (*Id.* at 2). Day-to-day enforcement of this policy occurred primarily at the facility level. (*See* Dkt. No. 201-29, ¶¶ 13–15; Dkt. No. 201-30, ¶ 11; Dkt. No. 201-31, ¶ 18;

---

[3] Only Martuscello, now the DOCCS commissioner, remains a DOCCS employee; the remaining CORC Defendants retired or left DOCCS after this action commenced in December 2017, except for Bellnier, who retired in September 2017. (Dkt. No. 201-29, ¶ 1; Dkt. No. 201-30, ¶ 2; Dkt. No. 201-31, ¶ 1; Dkt. No. 201-32, ¶ 1; Dkt. No. 201-33, ¶ 1).

Dkt. No. 201-32, ¶ 11; Dkt. No. 201-33, ¶ 11). Facility officials, including superintendents, who caught prisoners smoking indoors could issue them a Tier 1 disciplinary ticket, the least serious infraction. (*See* Dkt. No. 201-7, at 49–51; Dkt. No. 201-29, ¶ 15; Dkt. No. 201-35, ¶¶ 4, 15). Multiple Tier 1 tickets, however, could result in a Tier 2 ticket, carrying more serious consequences. (Dkt. No. 201-35, ¶ 15; Dkt. No. 201-41, ¶ 16; *see also* Dkt. No. 201-28, at 1–6). DOCCS retained records of Tier 2 tickets but "[u]sually" destroyed Tier 1 ticket records after 30 days. (Dkt. No. 201-14, at 165–68; *see also* Dkt. No. 201-7, at 51, 54, 82, 91). The parties dispute the extent to which Clinton staff enforced this policy; staff had "discretion" to engage in "counseling" in lieu of issuing a Tier 1 ticket. (Dkt. No. 201-29, ¶ 15; Dkt. No. 201-35, ¶ 15; Dkt. No. 201-41, ¶ 16).

As deputy commissioner for correctional facilities, Bellnier also played an enforcement role "through [the] chain of command down through the rank and file." (Dkt. No. 201-29, ¶ 13). And on at least one occasion, he took a more active role in enforcing the policy at Livingston Correctional Facility, after a county health official sent a letter to the Livingston superintendent stating that she had received an anonymous complaint that prisoners there smoked indoors. (*See* Dkt. No. 213-20, at 2; *see also* Dkt. No. 213-19, at 2; Dkt. No. 213-24, at 2; Dkt. No. 213-25, at 2; Dkt. No. 201-29, ¶ 18; Dkt. No. 201-7, at 69–81). Bellnier avers that he never believed Clinton suffered a similar problem.[4] (*See* Dkt. No. 201-29, ¶¶ 19–22).

---

[4] Defendants have also submitted a 2017 reaccreditation report from the American Correctional Association ("ACA") concerning Clinton, which Bellnier says he would have reviewed at the time. (Dkt. No. 201-29, ¶¶ 20–22; *see* Dkt. No. 201-27). Likewise, Bell avers that he "was present for the reaccreditation and [is] familiar with the process and the report." (*See* Dkt. No. 201-35, ¶¶ 21–23). That report stated of smoking at Clinton: "While cigarettes are sold in the commissary or otherwise received via approved packages, there was no obvious sign by sight or smell of their presence. All smoking must take place outside in designated areas and at specified times." (Dkt. No. 201-27, at 9). Plaintiff has submitted a letter from three United States senators reflecting that a prior congressional investigation and other sources revealed that "[t]he ACA's accreditation system has proven to be little more than a rubber stamp." (*See* Dkt. No. 213-32, at 2–3, 6).

Even after the indoor smoking ban, incarcerated individuals could smoke outside, (Dkt. No. 201-23, at 2), and Clinton's commissary sold cigarettes—"tobacco items . . . were always a big seller." (Dkt. No. 201-15, at 20–21; *see also id.* at 26 ("[T]obacco was a high demand item.")). One of Plaintiff's expert reports concluded that the DOCCS "commissary sales and package policy provide[d] [incarcerated] smokers with access to more [cigarettes] than they could be expected to smoke during [their] limited outdoor time." (*See* Dkt. No. 213-35, at 12–13). "Clinton's commissary records suggest," the expert noted, that prisoners "purchased the equivalent of an average of 2,108,513 cigarettes per year, and an additional 10,440 cigars or cigarillos."[5] (*Id.* at 12, 28 (citing Dkt. No. 201-15, at 19)). Additionally, Clinton prisoners could receive packages containing additional cigarettes. (*Id.* at 29 (describing DOCCS Directive #4911); *see also* Dkt. No. 201-8, at 114–16). And despite the indoor smoking ban, prisoners would keep lighters in their cells. (Dkt. No. 201-11, at 76; Dkt. No. 201-12, at 149–50). In 2017, before becoming superintendent, Bell was copied on an email that noted "the never-ending problem of inmates['] inappropriate use of lighters," and that proposed a solution that would, among other things, "prevent[] inmates from smoking indoors." (Dkt. No. 213-38, at 2).

### B.    ETS Exposure at Clinton

In his depositions, Plaintiff described his exposure to ETS at Clinton as follows. During his time there, Plaintiff was housed with other prisoners who "smoke[d] constantly," day and night. (Dkt. No. 201-4, at 31–32, 134; *see also* Dkt. No. 201-5, at 152–54). Of the 46 prisoners surrounding him, Plaintiff estimated that 42 smoked. (Dkt. No. 201-4, at 31). The smoke was "intense" and most concentrated at night, when everyone was in their cell—severe enough that

---

[5] Defendants submitted an expert report disputing Plaintiff's expert's "analysis of ETS exposure" at Clinton. (*See* Dkt. No. 224-2, at 1). The parties have also submitted competing expert reports concerning Plaintiff's medical history, but they are not material to the Court's analysis below. (*See* Dkt. Nos. 213-37, 224-3).

Plaintiff experienced "blackouts." (*Id.* at 32, 33–34). Worse yet, the cells had inadequate ventilations because prisoners would block off vents to prevent roaches from entering. (*Id.* at 22–25). DOCCS staff would also smoke indoors, often in "hideaways" out of security camera view. (*See id.* at 36–37, 51, 54).

Plaintiff wrote a February 2017 proposal for a non-smoking dormitory that contained similar allegations. (Dkt. No. 213-1, at 2–9). There, he explained that the smoke concentration was so severe that shirts hung overnight in his cell to dry would become "beige in color[] the morning after." (*Id.* at 8). Fellow prisoners, he said, would "smoke in 10-13 minute intervals in their cells, showers, and other places where they [were] not supposed to be smoking." (*Id.*). According to Plaintiff, "[t]he underenforcement of the non-smoking policy [was] the primary reason why" they smoked, endangering his "health, safety and well being." (*Id.*).

Testimony from another individual incarcerated at Clinton between 2011 and 2016, Daniel DePerno, confirmed that "a significant amount of [indoor] smoking occurred," and was "definitely an issue." (Dkt. No. 201-17, at 8, 10–11). DePerno also perceived the smoke as worse at night, estimating that "dozens" of individuals smoked in their cells then. (*Id.* at 10–11, 13–14, 21). The smoke gave DePerno "some asthma issues" he had not experienced before, and caused him to stay "up all night coughing and choking." (*Id.* at 11). Indoor smoking was "a topic of discussion" within the incarcerated population, especially among older individuals and those with asthma. (*Id.* at 14).

Although DOCCS staff would issue some "verbal reprimands" and "infractions" to those smoking in cells, Plaintiff testified, the indoor smoking ban was "not enforced adequately." (Dkt. No. 201-4, at 44–47, 52–53). Other times, with ETS clearly present in the air, Plaintiff would request that DOCCS staff instruct others to stop smoking, and they refused because they thought

6

Plaintiff "annoying [and] they themselves smoke[d]." (*Id.* at 50–51). Overall, Plaintiff explained, staff had a "nonchalant attitude" towards enforcement and an "unwritten policy" that prisoners could smoke inside if outside security cameras' view. (*Id.* at 48–49). Plaintiff "mentioned" the ETS exposure "to [Bell] a few times." (Dkt. No. 201-5, at 144). And one superintendent— Plaintiff did not specify which—would also make rounds, observe prisoners smoking in their cells, and do nothing. (*See* Dkt. No. 201-4, at 35, 48–49). DePerno, too, testified that Clinton staff refused to address the indoor smoking problem. (*See* Dkt. No. 201-17, at 11–13). He never witnessed DOCCS staff issue a ticket for indoor smoking. (*Id.* at 21–22).

Bell, Kirkpatrick, and other Clinton employees tell a different story. Bell and Kirkpatrick aver that "[t]he no smoking policy was enforced" during their tenures. (Dkt. No. 201-35, ¶¶ 15, 24; Dkt. No. 201-41, ¶ 16). Those smoking in cells were subject to discipline, they say, and both "witnessed very few individuals smoking in the facility," who "would put the cigarettes out immediately when approached." (Dkt. No. 201-35, ¶ 16; Dkt. No. 201-41, ¶ 17; *see also* Dkt. No. 201-11, at 106–10). A nurse who worked at Clinton during the relevant time also never witnessed indoor smoking. (*See* Dkt. No. 201-16, at 11, 13, 48–49). However, a deputy superintendent there did recall incarcerated individuals smoking inside, though "[n]ot very often" and never "in the hallways." (Dkt. No. 201-15, at 8, 60–61). Bell also observed smoking and recalled smelling ETS "a few times" while patrolling Clinton's cell blocks. (*See* Dkt. No. 201-11, at 106–09; *see also* Dkt. No. 201-35, ¶¶ 4, 15–16). He testified that, when he saw a prisoner smoking, he would tell the prisoner to "put it out immediately." (Dkt. No. 201-11, at 107). Bell suffers from asthma and is "disproportionately affected by tobacco smoke." (Dkt. No. 201-35, ¶ 14). Although staff issued "tickets for smoking in non-designated areas," Bell and Kirkpatrick say, it "was not a significant issue." (*Id.* ¶ 16; Dkt. No. 201-41, ¶ 17).

7

DOCCS records reflect four grievances at Clinton related to smoking between 2013 and 2018. (Dkt. No. 201-24, at 2). CORC records, however, do not reflect any smoking-related grievance appeals from Clinton. (*See* Dkt. No. 201-25, at 1–3). Other records show that Clinton's general population received over 80 infractions for smoking in undesignated areas during and after the relevant time. (Dkt. No. 201-28, at 4–6). Additionally, 2019 records show that Clinton staff believed prisoners' indoor smoking in the annex at that time was "out of control."[6] (*See* Dkt. No. 213-40, at 3; Dkt. No. 213-41, at 2; Dkt. No. 213-42, at 4).

### C.    Plaintiff's Exhaustion Efforts

Plaintiff has provided copies of two grievances describing his exposure to ETS at Clinton, as well as the resulting adverse health effects. (Dkt. No. 213-1, at 2–9; Dkt. No. 213-2, at 2). He testified that he sent the first grievance on October 5, 2016, but received no response. (Dkt. No. 213-2; Dkt. No. 201-4, at 83–84). Although Plaintiff submitted that grievance to Clinton's Incarcerated Grievance Program ("IGP"), he said, (*see* Dkt. No. 201-4, at 83–84), the IGP has no record of his ever filing the grievance, (Dkt. No. 201-49, ¶ 13; *see also* Dkt. No. 201-24, at 3). After receiving no response, Plaintiff wrote a letter addressed to the "IGRC Supervisor"[7] on October 12, purporting to appeal his October 5 grievance. (Dkt. No. 213-3, at 2). Plaintiff received no response to that letter either, and so he wrote the Clinton superintendent on October 21—enclosing the October 5 grievance—to appeal the lack of response. (*See* Dkt. No. 213-4, at 2). Finally, after again receiving no response from the superintendent, Plaintiff wrote to

---

[6] Bell was aware of this "out of control" smoking. (*See* Dkt. No. 213-40, at 3; *see also* Dkt. No. 201-35, ¶ 17; Dkt. No. 213-41, at 2). But, he says, the Clinton annex is a distinct area of the facility where Plaintiff "was not housed." (Dkt. No. 201-35, ¶ 17).

[7] "IGRC" refers to the Incarcerated Grievance Resolution Committee, a "committee of elected peers and appointed staff members" in each DOCCS facility constituted to resolve prisoner complaints. (*See* Dkt. No. 201-22, at 1).

the State Commission of Correction on October 31.[8] (Dkt. No. 213-5, at 2–3; Dkt. No. 213-6, at 2–3). Although DOCCS and the Commission of Correction "are not connected and perform different roles," (Dkt. No. 201-34, ¶ 4), Plaintiff copied each CORC Defendant on that letter, (*see* Dkt. No. 213-6, at 3).

Plaintiff sent a second grievance—dated February 10, 2017, and submitted the next day—enclosing the non-smoking dormitory proposal described above. (Dkt. No. 213-1, at 2–9). He testified that he received no response to this grievance either. (Dkt. No. 201-4, at 96). He then wrote a letter dated February 17 to the "I.G.R.C. Supervisor, CCF," stating that he "appeals his grievance dated 2/10/17" and requesting "a formal hearing." (Dkt. No. 213-7, at 2). Receiving no response, Plaintiff wrote to Kirkpatrick on February 23, again attaching his non-smoking dormitory proposal and including the phrase "Grievance Appeal" in the subject line. (Dkt. No. 213-8, at 2; *see also* Dkt. No. 201-26, at 2–9). Kirkpatrick responded to Plaintiff's letter the next day, informing him in a letter: "You are advised to submit any grievances, inquiries or appeals directly to the IGP Office, where all grievance files are maintained." (Dkt. No. 201-26, at 1). The letter, which reflected that Kirkpatrick was superintendent, explained that he was "returning [the] complaint so that [Plaintiff could] address [his] issues directly to the IGP Office." (*Id.*).

DOCCS grievance records from Clinton do not reflect either of Plaintiff's grievances or any letters from Plaintiff to the IGRC concerning ETS exposure. (*See* Dkt. No. 201-24, at 2–3).

After receiving Kirkpatrick's letter, Plaintiff sought to appeal to CORC.[9] (*See* Dkt. No. 201-4, at 106–07). To file an appeal to the superintendent, prisoners were required to "complete

---

[8] DePerno too filed a complaint concerning ETS exposure—which is reflected in Clinton grievance records, (*see* Dkt. No. 201-24, at 2)—but testified that, after receiving an IGRC response and appealing to the superintendent, he received no superintendent response and did not appeal that non-response to the CORC. (*See* Dkt. No. 201-17, at 19–22, 32–34; *see also* Dkt. No. 201-25, at 1–2).

[9] Clinton's IGP supervisor explained in her deposition that "if a grievance complaint was not received in the grievance office and not processed, that individual [could] file a grievance that their original complaint was not processed." (Dkt.

and sign the appeal section on the IGRC response form (Form #2131) and submit it to the grievance clerk within seven calendar days after receipt of the IGRC's written response"; to file a CORC appeal, they were required complete and submit to the grievance clerk the appeal section of the form on which the Superintendent issued his decision (Form #2133), and the grievance clerk would "transmit" that form to the facility IGP supervisor to be "forward[ed]" to CORC. (*See* Dkt. No. 201-22, at 10; *see also* Dkt. No. 201-51, ¶ 7; Dkt. No. 213-30, at 2).

Plaintiff did not follow this appeal process. (*Accord* Dkt. No. 201-52, at 1–2 (list of Plaintiff's prior CORC appeals, not including any related to smoking); *see also* Dkt. No. 201-51, ¶ 16). Instead, he sent each individual CORC member—Bruen, Bellnier, Koenigsmann, Martuscello, and McKoy—properly addressed letters stating that he was appealing his February 2017 grievance. (Dkt. No. 213-9, at 2–4; *see also* Dkt. No. 213-10, at 2; Dkt. No. 213-11, at 2; Dkt. No. 213-12, at 2; Dkt. No. 213-13, at 2). Plaintiff included with each letter a copy of that grievance and his non-smoking dormitory proposal, which as recounted above, contained details concerning his excessive ETS exposure at Clinton. (*See* Dkt. No. 213-9, at 4; Dkt. No. 213-10, at 3; Dkt. No. 213-11, at 3; Dkt. No. 213-12, at 3; Dkt. No. 213-13, at 3). The letters' subject lines stated "Appeal: from grievance, 2/11/17," and "Request Survey For Non-Smoking Dormitory." (Dkt. No. 213-10, at 2; Dkt. No. 213-11, at 2; Dkt. No. 213-12, at 2; Dkt. No. 213-13, at 2; *see also* Dkt. No. 213-9, at 4).

Because of their high-level positions, no CORC Defendant, they say, personally sorted or reviewed the large volume of mail sent to their offices, instead having staff perform that duty.

---

No. 201-13, at 24–25, 202–03). She also testified that an individual could inquire as to the status of a complaint, and if she did not have it, she would "determine whether it could be filed or [if] it would be considered to be untimely." (*Id.* at 203). DOCCS regulations further provided that prisoners who did not receive a timely response to their grievance could appeal the non-response. (*See id.* at 202; *see also* Dkt. No. 201-22, at 13). However, the Clinton IGP supervisor recalled at her deposition that the prisoners' "training" and "orientation" on the grievance program did not include an explanation of how to appeal a non-response. (*See* Dkt. No. 201-13, at 203–04).

(*See* Dkt. No. 201-6, at 55–58; Dkt. No. 201-7, at 24, 127–29, 132–33; Dkt. No. 201-8, at 40–41, 144–45; Dkt. No. 201-9, at 64–65; Dkt. No. 201-10, at 33–36; *see also* Dkt. No. 201-31, ¶ 6). Bellnier testified that if a prisoner's "grievance" or "complaint ultimately wound up on [his] desk, [he] would review it," possibly "even if [it] came to [him] outside of the formal grievance process." (Dkt. No. 201-7, at 127–28, 131). McKoy testified similarly. (*See* Dkt. No. 201-9, at 16–17, 24–26, 65–66). None recall personally reviewing Plaintiff's letters. (*See* Dkt. No. 201-6, at 128–29; Dkt. No. 201-7, at 138–39; Dkt. No. 201-8, at 146–47; Dkt. No. 201-9, at 72; Dkt. No. 201-10, at 37).

All aver that they never "investigate[d]" or "respond[ed]" to any such letters—except Koenigsmann, who does not recall doing so; neither do they recall "becoming aware of the subject matter of the complaints alleged in this lawsuit prior to being apprised of the existence of this litigation." (Dkt. No. 201-29, ¶ 10; Dkt. No. 201-30, ¶ 9; Dkt. No. 201-31, ¶ 16; Dkt. No. 201-32, ¶ 9; Dkt. No. 201-33, ¶ 9). As noted above, all the CORC Defendants now aver that they never personally served on CORC and instead appointed designees. (Dkt. No. 201-29, ¶ 6; Dkt. No. 201-30, ¶ 6; Dkt. No. 201-31, ¶ 11; Dkt. No. 201-32, ¶ 6; Dkt. No. 201-33, ¶ 6).

DOCCS has no record of Plaintiff's April 19 letters. (*See* Dkt. No. 201-51, ¶ 16; *see also* Dkt. No. 201-52, at 1–2; Dkt. No. 201-25, at 1–3). And Plaintiff never received a response to them. (*See* Dkt. No. 201-4, at 112–13).

### D.    Procedural History

#### 1.    Initial Litigation

Plaintiff filed his original pro se complaint in December 2017. (*See* Dkt. No. 1). There, he asserted Eighth Amendment claims against each CORC Defendant, but not Bell or Kirkpatrick. (*See id.* at 1, 8–9). The Court granted Plaintiff leave to proceed in forma pauperis, conducted an initial 28 U.S.C. § 1915(e)(2) review, and the CORC Defendants answered. (*See* Dkt. Nos. 10,

11

17). In September 2018, Plaintiff moved to amend the complaint, seeking to add additional claims and defendants, including Bell. (*See* Dkt. No. 23; Dkt. No. 23-2, at 1, 4). Among the claims he sought to assert against Bell was an Eighth Amendment claim for deliberate medical indifference. (*See* Dkt. No. 23-2, at 9; Dkt. No. 42, at 9). Plaintiff included in his allegations— which principally concerned unrelated events—a reference to symptoms he had suffered as a result of ETS exposure before his incarceration at Clinton. (*See* Dkt. No. 42, at 9–12 (citing Dkt. No. 42-1, at 38)). Plaintiff explained that "these episodes [would] occur when Plaintiff [was] exposed to [a] certain 'specific' gas as mentioned in [an attached] medical report," and that "gas" was cigarette smoke. (*Id.* at 9 (citing Dkt. No. 42-1, at 38)).

Magistrate Judge David E. Peebles denied Plaintiff's request to add Bell as a Defendant, reasoning that the proposed amended complaint "set forth completely different cause[s] of action[], wholly unrelated to the original claims, facts, or defendants," and that adding "new claims and defendants would create delay and result in prejudice to the defendants." (Dkt. No. 41, at 8–10). Plaintiff moved for reconsideration of that decision but withdrew that motion before Magistrate Judge Peebles could rule. (*See* Dkt. No. 47; Dkt. No. 51, at 1–2).

Defendants subsequently moved for summary judgment, arguing, among other things, that Plaintiff had failed to exhaust his administrative remedies, and that he had failed to demonstrate the CORC Defendants' personal involvement. (*See* Dkt. No. 80-1, at 3). Magistrate Judge Miroslav Lovric issued a report-recommendation recommending that the Court deny the motion. (Dkt. No. 88, at 2). As to exhaustion, Magistrate Judge Lovric concluded that, although Plaintiff failed to properly complete the three-step grievance process, there existed "an issue of fact as to the availability of administrative remedies." (*Id.* at 7–16). Neither party objected to the report-recommendation, and the Court adopted it in September 2020. (Dkt. No. 89).

But in December 2020, the Second Circuit decided *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), which clarified the standard for government officials' supervisory liability following *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). So the Court allowed supplemental briefing and affidavits addressing the CORC Defendants' personal involvement under *Tangreti*. (*See* Dkt. No. 101). In those affidavits the CORC Defendants averred—for the first time—that they never personally served on the CORC and instead appointed designees to serve on their behalf. (Dkt. No. 106-3, ¶ 9; Dkt. No. 106-4, ¶ 6; Dkt. No. 106-5, ¶ 6; Dkt. No. 106-6, ¶ 5; Dkt. No. 106-7, ¶ 6). None of them, however, could recall whom they had designated. (Dkt. No. 106-3, ¶ 10; Dkt. No. 106-4, ¶ 7; Dkt. No. 106-5, ¶ 7; Dkt. No. 106-6, ¶ 6; Dkt. No. 106-7, ¶ 7). The Court concluded that, in light of *Tangreti*, Plaintiff failed to demonstrate the CORC Defendants' personal involvement and granted summary judgment. (Dkt. No. 115, at 9–15).

### 2.    Appeal and Remand

Plaintiff appealed. (Dkt. No. 117). On appeal, Plaintiff challenged, as now relevant, this Court's granting Defendants' summary judgment motion without allowing additional discovery to determine the identity of the CORC designees, as well as Magistrate Judge Peebles's denial of Plaintiff's 2018 motion to amend the complaint to add Bell as a Defendant. (*See* Dkt. No. 124, at 3). The Second Circuit vacated and remanded, concluding that, "in the circumstances of this case, it was premature . . . to grant summary judgement . . . without first permitting [Plaintiff] an opportunity for additional discovery" to determine the CORC designees' identities. (*Id.* at 2, 4–5). As to the denial of Plaintiff's request to add Bell as a Defendant, the Circuit concluded as follows:

> Ordinarily, this would not be an abuse of discretion because the district court made no error of law, nor did it make a clearly erroneous assessment of the facts when it determined that the amended complaint only raised claims against Superintendent Bell with respect to an alleged assault, not the ETS exposure. At oral argument, however, the State, recognizing the serious nature of [Plaintiff's] allegations,

13

> agreed with the [Circuit] that it would like to be apprised of the situation at Clinton regarding ETS and suggested that "one possible route would be to remand for service on Bell." In this unusual posture, we remand for amendment of the complaint to join Superintendent Bell as a defendant to [Plaintiff's] ETS claim and for service on him.

(*Id.* at 6 (footnote and citations omitted)). Additionally, the Circuit directed this Court to appoint Plaintiff's current pro bono counsel. (*Id.* at 7).

### 3.     Subsequent Developments

On remand, the Court appointed pro bono counsel and permitted Plaintiff to file a second amended complaint naming Bell and Kirkpatrick as defendants. (*See* Dkt. Nos. 125, 134, 139). All Defendants timely answered, asserting the statute of limitations as an affirmative defense. (*See* Dkt. No. 150, at 6; *see also* Dkt. Nos. 145, 146).

Further discovery commenced. As now relevant, Plaintiff requested the following from Defendants: "CORC attendance lists from 2016-2018," "[r]ecords of grievances and complaints about indoor smoking filed by other Clinton incarcerated individuals," and "[d]ocuments related to the enforcement of Clinton's no-smoking policy, including incarcerated individual misbehavior reports concerning the punishment or corrective action taken for violations of smoking-related policies" and "Clinton logbooks from 2016-2018 identifying individuals that held supervisory positions at Clinton." (Dkt. No. 211, at 9 (citing Dkt. No. 169, at 7–10; Dkt. No. 213-50, at 8; Dkt. No. 213-51, at 8)).

DOCCS policy establishes retention schedules for various categories of documents. (*See generally* Dkt. No. 213-47). But for "[r]ecords being used [in] legal actions," the schedules do not apply; such documents "must be kept until . . . the legal action ends, even if their minimum retention period has passed." (*Id.* at 3). Under this system, when a litigation hold was put in place by DOCCS counsel or the attorney general's office, DOCCS staff would separate the relevant

14

folders by placing them in a separate file cabinet from the documents to be destroyed. (*See* Dkt. No. 201-14, at 59–63).

In this case, however, no litigation hold was put in place until June 2024—over six years following the December 2017 complaint. (Dkt. No. 213-16, at 2–3). At oral argument, defense counsel could not "answer . . . with any certainty" why his office had taken so long to institute such a hold. Counsel explained that it is his practice to "put a litigation hold on all new cases [he] handle[s]," so he had "assum[ed] [that] there was a litigation hold put" in place before. Defense counsel noted that when Plaintiff's counsel asked about a litigation hold, defense counsel discovered that there had been no litigation hold and disclosed it immediately.

The documents Plaintiff requested in each of the above categories are no longer available. The CORC attendance lists from 2016 through 2018 have been destroyed. (*See* Dkt. No. 213-21, at 7; Dkt. No. 213-22, at 8; Dkt. No. 213-23, at 7; Dkt. No. 213-26, at 8; Dkt. No. 213-29, at 8). Defense counsel represented at oral argument that the 2016 list was destroyed at some point in 2021, the 2017 list in 2022, and the 2018 list in 2023. Records underlying other Clinton prisoners' smoking grievances were also destroyed. (*See* Dkt. No. 213-43, at 2). Although, as the Clinton IGP supervisor testified, DOCCS maintains a permanent log of grievances containing basic information, (Dkt. No. 201-13, at 25, 230–31; *see also* Dkt. No. 201-24, at 2), the underlying documents—including the grievance itself, investigative documents, decisions, and appeals—are destroyed after a set number of years, (*see* Dkt. No. 201-13, at 234–35; Dkt. No. 213-47, at 8). Specifically, all such documents are retained "for the current year plus the last four previous calendar years." (Dkt. No. 213-47, at 8). In accord with that policy, DOCCS destroyed all 2016 grievance records—including those related to DePerno's March 2016 grievance—in January 2021. (*See* Dkt. No. 213-43, at 2–4). Additionally, physical copies of Tier 2 disciplinary

15

tickets were preserved for five years; so any from 2016 through 2018 were destroyed after 2023. (*See* Dkt. No. 213-47, at 11; *see also* Dkt. No. 201-14, at 169). Finally, logbooks containing the names of individuals who held supervisory positions at Clinton during the relevant time period— also to be retained for five years under DOCCS policy—were likewise destroyed. (*See* Dkt. No. 213-46, at 2–3).

## III.    MOTION FOR SPOLIATION SANCTIONS

### A.    Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*, 144 F.4th 360, 374 (2d Cir. 2025) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). "A party seeking sanctions based on spoliation must establish by a preponderance of evidence: '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Id.* (quoting *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018)); *see also Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012). District courts possess "inherent power to sanction bad faith litigation abuse," including "discovery abuses that do not clearly violate" the relevant civil rules. *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235–36 (2d Cir. 2020). "The choice of an appropriate remedy for spoliation 'is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis.'" *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570,

16

580 (S.D.N.Y. 2017) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).

### B.    Analysis

To begin, the Court rejects Defendants' contentions that the sanctions motion is untimely, or that it is "an inappropriate supplementation" to Plaintiff's summary judgment opposition. (Dkt. No. 225-7, at 13–16 (boldface and capitalization omitted)). As Plaintiff's counsel noted at oral argument, Magistrate Judge Lovric directed that the spoliation issue be addressed after discovery closed. *See* September 6, 2024 Minute Entry. In any event, the Court has inherent authority to manage its docket "so as to achieve the orderly and expeditious disposition of cases," and concludes that the sanctions motion is best considered concurrently with the summary judgment motion. *See Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)).

Plaintiff asserts that spoliation sanctions are warranted for the destruction of four categories of documents: (1) "the CORC attendance lists from 2016–2018 containing the identity of any CORC designees of the CORC Defendants"; (2) "records of individual grievances and complaints about indoor smoking filed by other Clinton incarcerated individuals"; (3) "incarcerated individual misbehavior reports concerning the punishment or corrective action taken for violations of smoking-related policies"; and (4) "Clinton logbooks from 2016–2018 identifying individuals that held supervisory positions at Clinton." (Dkt. No. 211, at 6). The Court addresses each category in turn.

#### 1.    Spoliation

##### a.    CORC Attendance Lists

Plaintiff has met each spoliation element as to the CORC attendance lists from 2017 to 2018. Turning to the first element, "the obligation to preserve evidence arises when the party has

notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *ELG Utica Alloys*, 144 F.4th at 375 (alteration adopted) (quoting *Fujitsu*, 247 F.3d at 436). Defendants here had notice that the lists would be relevant at least as of the time they filed their supplemental summary judgment motion in April 2021, arguing that they were not personally involved because they had appointed the designees to fulfill their CORC responsibilities.[10] (*See* Dkt. No. 106-1, at 9, 12). However, the 2017 and 2018 designee lists were destroyed in 2022 and 2023, respectively.

As to the second element, "[a] party may establish a culpable state of mind by showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently." *ELG Utica Alloys*, 144 F.4th at 375 (cleaned up). "While a failure to institute a litigation hold does not alone constitute gross negligence, it is a factor relevant to the determination." *Id.* (citing *Chin*, 685 F.3d at 162). "Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003).

Here, the destruction of the 2017 and 2018 designee lists in 2022 and 2023 was "at a minimum" negligent because the duty to preserve attached at least as of April 2021. *See id.* Given Defendants' unexplained failure to institute a litigation hold for over six years after the start of this litigation—and the particular relevance of the CORC designee lists to the litigation

---

[10] District courts in this Circuit have generally concluded "that the relationship between DOCCS and its employees is sufficiently closely coordinated to find that DOCCS employees have control over evidence held by DOCCS." *Matthews v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 9:17-cv-503, 2023 WL 2664418, at *9, 2023 U.S. Dist. LEXIS 52318, at *27–28 (N.D.N.Y. Mar. 28, 2023) (internal quotation marks omitted) (collecting cases). As noted above, all but one CORC Defendant either currently work for DOCCS or retired during the pendency of the litigation. In any event, all CORC Defendants now appear sufficiently closely coordinated with DOCCS such that they could have produced the 2017 and 2018 CORC attendance lists in April 2021, before those lists were destroyed. (*See* Dkt. No. 213-53, at 2 ("These documents are produced by [all the CORC Defendants] in their official capacity only, in that *their office is responsible for custody of the documents*." (emphasis added))).

following the April 2021 supplemental affidavits stating that designees acted on the CORC Defendants' behalf—the Court further concludes that the lists' destruction was gross negligence.

Finally, the Second Circuit has "held that a showing of gross negligence in the destruction of evidence can stand alone to satisfy the relevance factor." *ELG Utica Alloys*, 144 F.4th at 375–76 (cleaned up). Having concluded that the destruction of the 2017 and 2018 CORC attendance lists was grossly negligent, the Court finds the final spoliation requirement satisfied as to those documents.[11]

### b.      Remaining Documents

The Court reaches a different conclusion as to the remaining categories of documents. First, Plaintiff has not established that the underlying documents related to smoking grievances at Clinton fell within the scope of Defendants' "obligation to preserve." *ELG Utica Alloys*, 144 F.4th at 374 (quoting *Klipsch Grp.*, 880 F.3d at 628). The scope of a party's obligation to preserve extends to documents "it knows, or reasonably should know, [are] relevant in the action, [are] reasonably calculated to lead to the discovery of admissible evidence, [are] reasonably likely to be requested during discovery and/or [are] the subject of a pending discovery request." *Zubulake*, 220 F.R.D. at 217 (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991)). "[I]n any case raising issues of spoliation, the court's determination of the scope of the duty to preserve is a highly fact-bound inquiry that involves considerations of proportionality and reasonableness." *See Tracy v. NVR, Inc.*, No. 04-CV-6541L, 2012 WL 1067889, at \*9, 2012 U.S. Dist. LEXIS 44350, at \*29–30 (W.D.N.Y. Mar. 26,

---

[11] The Court addresses only the 2017 and 2018 CORC lists, as Plaintiff has not shown that Defendants "should have known that the [2016 lists would] be relevant to future litigation" based on his copying the CORC Defendants on his October 2016 letter to the Commission of Correction. *ELG Utica Alloys*, 144 F.4th at 375.

2012) (collecting cases); *Roytlender v. D. Malek Realty, LLC*, No. 21-cv-00052, 2022 WL 5245584, at *4, 2022 U.S. Dist. LEXIS 183438, at *9–10 (E.D.N.Y. Oct. 6, 2022) (similar).

Plaintiff argues that, as of the time he filed his complaint, "Defendants were on notice as to the potential relevance of all records concerning nonsmoking policies at Clinton and their enforcement, and documents relating to the appeals of smoking grievances during the relevant time period." (Dkt. No. 211, at 15). Defendants did maintain records of grievances filed during the relevant time, which revealed that other Clinton prisoners had filed smoking-related grievances. (*See* Dkt. No. 201-24, at 2). But, on the facts of this case, the Court cannot conclude that Defendants should reasonably have known that they had an obligation to preserve all the records underlying those grievances, none of which directly concerned Plaintiff or were appealed to CORC. (*See* Dkt. No. 201-25, at 1–3); *cf. Raymond v. City of New York*, No. 15 Civ. 6885, 2020 WL 7055572, at *6, 2020 U.S. Dist. LEXIS 225957, at *18 (S.D.N.Y. Dec. 2, 2020) (explaining that parties should preserve discovery from "key players," including "individuals mentioned in the complaint as present during critical events and to whom plaintiff reported" relevant conduct (citing *Alter v. Rocky Point Sch. Dist.*, No. 13-1100, 2014 WL 4966119, at *9, 2014 U.S. Dist. LEXIS 141020, at *22–23 (E.D.N.Y. Sept. 30, 2014))).

Second, as to the incarcerated individual misbehavior reports, Defendants correctly note that, in 2019, Magistrate Judge Peebles denied Plaintiff's discovery request for a "[c]omputer [p]rint-out for [i]nmate[s] [d]isciplined for smoking violations, 2016-2018 at Clinton Correctional Facility." (*See* Dkt. No. 33-1, at 2; *see also* Dkt. No. 64 (text order denying discovery requests with the exception of any studies of the DOCCS indoor smoking policy); Dkt. No. 136, at 4–6, 17–18 (transcript of discussion concerning this request at discovery hearing)). The Court cannot conclude that—in destroying the reports underlying the list a magistrate judge

20

did not require them to produce—Defendants acted with a sufficiently culpable state of mind. *See ELG Utica Alloys*, 144 F.4th at 375; *Zubulake*, 220 F.R.D. at 220 & n.46.

Finally, as to the logbooks of individuals holding supervisory positions at Clinton, Plaintiff cannot satisfy the first element. From the beginning of the litigation in 2017 until the Second Circuit's 2023 mandate, the case concerned only the CORC Defendants, not any facility-level DOCCS employees at Clinton. And even after the mandate, only Bell and Kirkpatrick—both superintendents, not lower-level Clinton officials—were implicated. Therefore, Defendants lacked sufficient "notice that the [the logbooks would be] relevant to litigation." *ELG Utica Alloys*, 144 F.4th at 375 (quoting *Fujitsu*, 247 F.3d at 436).

### 2. Sanctions

The Court now considers the appropriate sanctions for the spoliation of the 2017 and 2018 CORC attendance lists. District courts possess "broad discretion in crafting a proper sanction for spoliation." *West*, 167 F.3d at 779. Such sanctions "should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" *Id.* (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). "It is well accepted that a court should always impose the least harsh sanction that can provide an adequate remedy. The choices include—from least harsh to most harsh—further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal (terminating sanctions)." *Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 469 (S.D.N.Y. 2010)).

21

Plaintiff requests, among other things, that the Court impose as sanctions "an order precluding the CORC Defendants from arguing that they were not personally involved in Plaintiff's alleged exposure to ETS because they delegated their duties on the CORC," as well as "costs and attorney's fees associated with bringing this motion." (Dkt. No. 211, at 28). The Court agrees that these two sanctions are appropriate under the circumstances. Precluding the CORC Defendants' delegation argument restores the parties to the position they "would have been in absent the wrongful destruction of" the CORC designee lists after the CORC Defendants asserted that defense, while also appropriately proportioning "the risk of an erroneous judgment." *West*, 167 F.3d at 779 (quoting *Kronisch*, 150 F.3d at 126). And requiring the CORC Defendants—the only Defendants in the action at the time the CORC attendance lists were destroyed—to pay costs and fees in connection with the spoliation motion will seek to make Plaintiff's counsel whole and will deter future spoliation of this kind. *See id.*

The Court declines, however, to impose any additional sanction. No more is necessary "to vindicate the trifold aims of" the spoliation rule. *Id.* at 780; *Dorchester Fin. Holdings Corp.*, 304 F.R.D. at 185. Importantly, a "trial ideally is a search for the truth," and although "spoliation can interfere with that inquiry, so too, can an overbroad sanction." *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 53 (S.D.N.Y. 2014) (quoting *Portuondo v. Agard*, 529 U.S. 61, 77 (2000) (Ginsburg, J., dissenting)). As Plaintiff's counsel acknowledged at oral argument, even accounting for the preclusion sanction described above, there must still exist a genuine issue of fact as to each CORC Defendant's personal involvement for Plaintiff's claims to survive summary judgment.

## IV.    MOTION FOR SUMMARY JUDGMENT

### A.    Legal Standard

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (per curiam) (explaining that summary judgment is appropriate where the nonmoving party fails "'to come forth with evidence sufficient to permit a reasonable juror to return a verdict in [their] favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot "rely on mere speculation or conjecture as to the true nature of the facts

23

to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)). "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alterations adopted) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### B.    Analysis

#### 1.    Superintendent Defendants

##### a.    Statute of Limitations

Bell and Kirkpatrick first assert that Plaintiff's claims against them are barred by the statute of limitations. (Dkt. No. 201-2, at 6–14). In Plaintiff's appeal, the Second Circuit addressed his claim against Bell, (*see* Dkt. No. 124, at 5–6), so the Court begins by discussing the mandate rule and the summary order's effect on that claim's timeliness. It then addresses the merits of the statute of limitations defense as to Kirkpatrick.

###### i.    Bell

The mandate rule is a "subsidiary" principle of the law of the case doctrine. *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001); *Burrell v. United States*, 467 F.3d 160, 165 (2d Cir. 2006). It "compels compliance on remand with the dictates of the superior court." *Ben Zvi*, 242 F.3d at 95 (quoting *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993)). "In following a mandate, the lower court must carry out its duty to give the mandate 'full effect.'" *In re Coudert Brothers LLP*, 809 F.3d 94, 98 (2d Cir. 2015) (quoting *Ginett v. Comput. Task Grp., Inc.*, 11 F.3d 359, 360 (2d Cir. 1993)); *Callahan v. Cnty. of Suffolk*, 96 F.4th 362, 367 & n.7 (2d Cir. 2024). Accordingly, a "district court's actions on remand should not be inconsistent with either the express terms *or the spirit* of the mandate." *In re Ivan F. Boesky Sec. Litig.*, 957 F.2d 65, 69 (2d Cir. 1992) (emphasis added); *see also Kotler v. Jubert*, 986 F.3d 147, 159 (2d Cir. 2021) (same).

24

The district court "must always look to the opinion to interpret the mandate." *See Meacham v. Knolls Atomic Power Lab'y*, 358 F. App'x 233, 235 (2d Cir. 2009) (quoting *Fed. Trade Comm'n v. Standard Educ. Soc'y*, 148 F.2d 931, 932 (2d Cir. 1945) (per curiam)); *cf. Callahan*, 96 F.4th at 367 ("[T]here are cases where the language and scope of the mandate requires the district court to devote some additional analysis to determine what it may (and may not) consider on remand.").[12]

Upon careful reading of the Second Circuit's summary order, the Court concludes that Plaintiff's ETS-related claim against Bell is not barred by the statute of limitations. Plaintiff moved to amend his complaint to add Bell as a defendant in September 2018—well within the three-year "statute of limitations for § 1983 [claims] arising in New York," as the underlying conduct occurred between 2016 and 2018. *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020). Had he asserted an ETS-related claim against Bell in his proposed amended complaint attached to the September 2018 motion, that claim would have been timely. *See Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017). Magistrate Judge Peebles, however, issued the November 2018 order concluding that the proposed amended complaint did not assert such a claim. (*See* Dkt. No. 41, at 8–10). That order merged with this Court's now-vacated 2021 final judgment and was squarely before the Circuit in Plaintiff's appeal from that judgment. *See, e.g.*, *Marquez v. Silver*, 96 F.4th 579, 582 (2d Cir. 2024). Indeed, on appeal, Plaintiff expressly challenged Magistrate Judge Peebles's determination "that the [2018 proposed] amended complaint only raised claims against Superintendent Bell with respect to an alleged assault, not the ETS exposure." (*See* Dkt. No. 124, at 3, 6 (footnote omitted)). So as Plaintiff notes, Bell's

---

[12] In "very limited" circumstances, "there may be rare exceptions" to the mandate rule, but this case is not one. *See Callahan*, 96 F.4th at 368 (explaining that exceptions are "reserved for situations when developments occurring after a mandate issued would make the mandated conduct pointless or clearly irrational").

25

statute of limitations defense hinges on whether the mandate "effectively reversed" Magistrate Judge Peebles's November 2018 order determining that the proposed amended complaint did not state an ETS-related claim against Bell. (*See* Dkt. No. 232, at 2).

The summary order never states whether the November 2018 order's ETS claim holding was an abuse of discretion—explaining only that, "[o]rdinarily," it "would not be," "because the district court made no error of law" or "clearly erroneous assessment of the facts."[13] (Dkt. No. 124, at 6 (citing *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 389 (2d Cir. 2015), for the proposition that the Circuit "ordinarily" does not "identify [an abuse of discretion] absent an error of law, a clearly erroneous assessment of the facts, or a decision outside the range of permissible choices")).[14] Ultimately, however, the panel vacated and remanded in light of the appeal's "unusual posture" following oral argument. (*See* Dkt. No. 124, at 6). Specifically, the summary order noted: "At oral argument, . . . the State, recognizing the serious nature of [Plaintiff's] allegations, agreed with the [panel] that it would like to be apprised of the situation at Clinton regarding ETS and suggested that one possible route would be to remand for service on Bell." (*Id.* (cleaned up)).

The parties agree that the panel discerned no abuse of discretion as to the ETS claim holding. (*See* Dkt. No. 232, at 2; Dkt. No. 233, at 3). Nor, Bell notes, did the summary order discuss the "merit[s] or timeliness of" amendment. (Dkt. No. 233, at 3). So under these circumstances, he argues, "it is appropriate for th[is] Court to now determine, for the first time, [whether] Plaintiff's claim[] against [him was] timely." (*Id.*). Plaintiff, on the other hand, asserts that the panel "determined that reversal of the denial of leave to amend was appropriate, because,

---

[13] The Court expressly "agree[d] with the . . . conclusion not to permit amendment to add" claims "unrelated" to ETS exposure. (Dkt. No. 124, at 6 & n.4)

[14] The summary order does not state that the November 2018 order was outside the range of permissible choices.

although not an abuse of discretion, there was still error in that ruling warranting, not remand for reconsideration of that denial, but instead the relief associated with a reversal." (Dkt. No. 232, at 2).

Whatever its reasoning, as described above, the Circuit was squarely confronted with the question of whether to affirm or reverse Magistrate Judge Peebles's November 2018 order. The mandate vacated this Court's 2021 judgment—with which that order had merged—in its entirety. (Dkt. No. 124, at 2, 7). And it remanded "for further proceedings consistent with" the summary order—specifically, "amendment of the complaint to join Superintendent Bell as a defendant to [Plaintiff's] ETS claim and for service on him," precisely the relief the November 2018 order denied. (*Id.* at 2, 6, 7). Under these circumstances, to give full effect to the mandate's "broader spirit," the Court concludes that the mandate reversed that order insofar as it held that the 2018 proposed amended complaint failed to assert an ETS-related claim against Bell. *See Kotler*, 986 F.3d at 159 (quoting *Burrell*, 467 F.3d at 165); *Coudert Brothers*, 809 F.3d at 98. So as a result of the mandate, Plaintiff timely asserted that claim in 2018.[15] *See Pasternack*, 863 F.3d at 175. Accordingly, the Court denies summary judgment as to Bell on statute of limitations grounds.

### ii.    Kirkpatrick

Turning to Kirkpatrick—whom the mandate did not address, as he was not a party to the appeal—the Court rejects Plaintiff's threshold statute of limitations arguments. (*See* Dkt. No. 212, at 14–17). Even assuming the invited error doctrine could apply in this procedural context, government counsel made no representations concerning Kirkpatrick on appeal. She therefore

---

[15] To be sure, the mandate rule only bars consideration of "issues 'explicitly or implicitly decided on appeal.'" *See United States v. Aquart*, 92 F.4th 77, 87 (2d Cir. 2024) (quoting *Burrell*, 467 F.3d at 165). And as Bell notes, the Circuit did not address the timeliness of the ETS claim against Bell on appeal. (Dkt. No. 233, at 3). But it did rule on the November 2018 order's declining to construe the proposed amended complaint to assert such a claim. And for the reasons explained, the Circuit's ruling on that issue is dispositive of the claim's timeliness.

could not have invited any error as to him. *Cf. United States v. Saab*, 164 F.4th 198, 213 (2d Cir. 2026) ("[I]n assessing waiver, our north star is always whether [a party] intentionally relinquished a known right under the particular circumstances of a case." (cleaned up)). For the same reasons, the Court cannot preclude Kirkpatrick from raising the statute of limitations based on current defense counsel's ethical obligations. (*Contra* Dkt. No. 212, at 16–17 (citing *DaCosta v. City of New York*, 296 F. Supp. 3d 569, 600–01, 605 (E.D.N.Y. 2017))). Nor can it do so based on any delay—presumably caused by the parties' compliance with the Circuit's mandate that they resume discovery on remand—in raising the defense. Kirkpatrick asserted the statute of limitations in a timely filed answer, and Plaintiff points to no adequate basis for the Court to decline to consider it. (*See* Dkt. No. 150, at 6).

As to the merits of that defense, for the operative second amended complaint's claims against Kirkpatrick to be timely, they must relate back either to the original complaint, or the proposed first amended complaint attached to Plaintiff's 2018 motion to amend. *See Hogan v. Fischer*, 738 F.3d 509, 517–18 (2d Cir. 2013); *Pasternack*, 863 F.3d at 175. The parties agree that Plaintiff's claims may relate back if they meet the requirements of New York's relation back standard, or the federal rules' relation back standard. *See* Fed. R. Civ. P. 15(c)(1)(A), (C); *Hogan*, 738 F.3d at 518.

Under New York law, claims against a new party relate back to a prior pleading "when (1) the claims arise out of the same conduct, transaction or occurrence; (2) the new party is 'united in interest' with an original defendant and thus can be charged with such notice of the commencement of the action such that a court concludes that the party will not be prejudiced in defending against the action; and (3) the new party knew or should have known that, but for a mistaken omission, they would have been named in the [prior] pleading." *Nemeth v. K-Tooling*,

28

40 N.Y.3d 405, 407–08 (2023) (citing *Buran v. Coupal*, 87 N.Y.2d 173, 178 (1995)). "The doctrine focuses on the notice and prejudice to the added party." *Id.* at 408; *see also DaCosta*, 296 F. Supp. 3d at 585–86 (citing *Buran*, 97 N.Y.2d at 180–81). The parties here dispute only the second and third requirements.

As to the second, "the question of unity of interest is to be determined from an examination of (1) the jural relationship of the parties whose interests are said to be united and (2) the nature of the claim asserted against them by the plaintiff." *Amaya v. Garden City Irrigation, Inc.*, 645 F. Supp. 2d 116, 122 (E.D.N.Y. 2009) (quoting *Connell v. Hayden*, 83 A.D.2d 30, 42–43 (2d Dep't 1981)); *see also DaCosta*, 296 F. Supp. 3d at 586. A "jural relationship" is a "legal relationship giving rise to potential liability." *Amaya*, 645 F. Supp. 2d at 122 (citing *Connell*, 83 A.D.2d at 43). Two parties "are united in interest only when their interest in the subject-matter of the proceeding is such that [they] stand or fall together and that judgment against one will similarly affect the other." *130-10 Food Corp. v. N.Y. State Div. of Hum. Rts.*, 166 A.D.3d 962, 965 (2d Dep't 2018) (cleaned up); *see also Mongardi v. BJ's Wholesale Club, Inc.*, 45 A.D.3d 1149, 1150 (3d Dep't 2007); *Mondello v. N.Y. Blood Ctr. – Greater N.Y. Blood Program*, 80 N.Y.2d 219, 226 (1992). Two parties may be united in interest when one is vicariously liable for another, *see, e.g.*, *Mondello*, 80 N.Y.2d at 226; *Mongardi*, 45 A.D.3d at 1151, or when there exists "a practical unity of interest"—for example, where one party has a duty to indemnify the other and a "uniform practice" of doing so, *see DaCosta*, 296 F. Supp. 3d at 586 (city unified in interest with its police officers); *Austin v. Interfaith Med. Ctr.*, 264 A.D.2d 702, 704 (2d Dep't 1999). Parties "are not united in interest," however, "if there is a possibility that the new party could have a defense different from that of the original party." *130-10 Food*

29

*Corp.*, 166 A.D.3d at 965; *see also Higgins v. City of New York*, 144 A.D.3d 511, 513 (1st Dep't 2016); *Montalvo v. Madjek, Inc.*, 131 A.D.3d 678, 680 (2d Dep't 2015).

Here, Kirkpatrick is not united in interest with either the CORC Defendants or Bell—assuming that, as a result of the mandate, the proposed first amended complaint stated an ETS-related claim against the latter. Neither group is vicariously liable for Kirkpatrick, nor is one responsible for indemnifying him. To be sure, all may be indemnified by the state; and as Plaintiff notes, all are sued in their official capacities. But ultimately, Kirkpatrick is not united in interest with either the CORC Defendants or Bell because—regardless of the capacity in which they are sued—he "could have a defense different from" theirs. *130-10 Food Corp.*, 166 A.D.3d at 965. Kirkpatrick could escape § 1983 liability by demonstrating that he was not deliberately indifferent to Plaintiff's exposure to ETS smoke, even had the CORC Defendants been deliberately indifferent, and vice versa. *See Tangreti*, 983 F.3d at 612 (requiring plaintiffs to "prove that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution'" (quoting *Iqbal*, 556 U.S. at 676)). The same is true of Kirkpatrick and Bell. *See id.*; *cf. Amaya*, 645 F. Supp. 2d at 122 (parties united in interest "when *because of some legal relationship*" they "necessarily have the same defenses to the plaintiff's claim" (emphasis added) (quoting *Connell*, 83 A.D.2d at 43)); *City of New York v. Lexington Ins. Co.*, 735 F. Supp. 2d 99, 112 (S.D.N.Y. 2010) (same). These defendants therefore do not "stand or fall together [such] that judgment against one will similarly affect the other," so the united in interest prong is unmet. *130-10 Food Corp.*, 166 A.D.3d at 965 (quoting *Montalvo*, 131 A.D.3d at 679–60). The claim against Kirkpatrick thus does not relate back to the original complaint or proposed first amended complaint under New York law.

30

Accordingly, the Court addresses the federal relation back standard. *See Hogan*, 738 F.3d at 518. For a claim against a new party to relate back under Rule 15(c)(1)(C), several conditions must be met, including that—within the time prescribed "by Rule 4(m) for serving the summons and complaint"—the new "party knew or should have known that, but for a mistake of identity, the original action would have been brought against" him. *Ceara v. Deacon*, 916 F.3d 208, 211 (2d Cir. 2019) (alteration adopted) (quoting *Hogan*, 738 F.3d at 517); Fed. R. Civ. P. 15(c)(1)(C)(ii).

"A mistake is an error, misconception, or misunderstanding; an erroneous belief." *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 548 (2010) (cleaned up). "That a plaintiff knows of a party's existence," however, "does not preclude [the plaintiff] from making a mistake with respect to that party's identity." *Id.* at 549. Rather, a plaintiff might still make a mistake of identity where, despite knowing a party exists, the plaintiff "lack[s] knowledge regarding the conduct or liability of that party." *Abdell v. City of New York*, 759 F. Supp. 2d 450, 457 (S.D.N.Y. 2010) (Sullivan, J.) (citing *Krupski*, 560 U.S. at 549). Ultimately, the "only question" is whether "the prospective *defendant* knew or should have known during the Rule 4(m) period" that the plaintiff made such a mistake. *Krupski*, 560 U.S. at 548–49 (emphasis in original); *see also Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Grp.*, 624 F. App'x 23, 27–28 (2d Cir. 2015). So in conducting that inquiry, "[i]nformation in the plaintiff's possession is relevant only if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity." *Krupski*, 560 U.S. at 548.

Here, no genuine factual dispute exists as to whether Kirkpatrick understood, or "should have understood, that he escaped suit during the limitations period *only because* [Plaintiff]

31

misunderstood a crucial fact about his identity." *Krupski*, 560 U.S. at 550 (emphasis added). The record reflects that he did not.

Preliminarily, this case is not one in which Plaintiff originally sued a party "*legally unable to provide relief.*" *See Krupski*, 560 U.S. at 555 (emphasis added); *cf. Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 469 (2d Cir. 1995), *amended*, 74 F.3d 1366, 1366 (2d Cir. 1996) ("The Advisory Committee Notes to [a prior version of Rule 15(c)(1)(C)] state that this subsection cures the problems that arise, for example, when a defendant mistakenly sues an agency of the government without knowing that the cause of action requires the defendant to sue an agency head."). The CORC Defendants and Bell are not categorically improper defendants. Rather, as discussed in detail below, their liability depends on their conduct. Additionally, Kirkpatrick contends that Plaintiff's omitting him from this action "clearly was not a mistake." (*See* Dkt. No. 201-2, at 13). But nothing reflects that Kirkpatrick previously knew of any evidence supporting that contention. So such evidence has no "bear[ing] on [*his* own] understanding of whether [Plaintiff] made a mistake regarding [his] identity," and the Court will not consider it. *See Krupski*, 560 U.S. at 548.

Nevertheless, Plaintiff sent Kirkpatrick a letter—attaching his non-smoking dormitory proposal—to which Kirkpatrick responded, directing Plaintiff to address his issues to Clinton's IGP office. (*See* Dkt. No. 201-26, at 1–9). That response reflected that Kirkpatrick was then the Clinton superintendent. (*Id.* at 1). As a result, Kirkpatrick would have reasonably concluded that Plaintiff knew of his existence. Crucially, too, Kirkpatrick would have reasonably understood Plaintiff to be fully aware of his "conduct" related to, or potential "liability" for, ETS exposure— both as to Kirkpatrick's handling of Plaintiff's letter raising that issue, and as to his broader responsibility for enforcing the non-smoking policy at Clinton. *Abdell*, 759 F. Supp. 2d at 457;

32

*Krupski*, 560 U.S. at 549; *cf. Gudanowski v. Burrell*, No. 23-6552, 2024 WL 3594320, at *3, 2024 U.S. App. LEXIS 18978, at *8–10 (2d Cir. July 31, 2024) (no mistake of identity in excessive force case where plaintiff knew of officers' presence at scene and roles in incident).

So even assuming the Court could impute government counsel's knowledge of this litigation to Kirkpatrick, (*see* Dkt. No. 212, at 20), nothing in the original or proposed first amended complaints' contents would reasonably have altered Kirkpatrick's impression—based on the prior letter and response—that Plaintiff made no mistake *of identity*.[16] *See Krupski*, 560 U.S. at 549–50. So there exists no genuine dispute as to whether Kirkpatrick, within the Rule 4(m) period, knew or should have known that Plaintiff made such a mistake in failing to name him as a defendant. Kirkpatrick had no reason to. The claim against him therefore does not relate back to either prior complaint, and must be dismissed as barred by the statute of limitations. *See* Fed. R. Civ. P. 15(c)(1)(C)(ii).

### b.    Exhaustion

Bell next asserts that Plaintiff failed to exhaust his administrative remedies. (*See* Dkt. No. 201-2, at 14–19). Plaintiff argues, among other things, that Magistrate Judge Lovric's previous exhaustion ruling is law of the case. (*See* Dkt. No. 212, at 22–23). The Court agrees.

Under the law of the case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *Callahan*, 96 F.4th at 367 n.6 (quoting *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 607 (2d Cir. 1999)). Although this doctrine is "discretionary," in cases "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for

---

[16] Plaintiff also points to *Ward v. Taylor*, 250 F.R.D. 165, 167, 169–70 (D. Del. 2008). (Dkt. No. 232, at 1–2). But that case is factually distinguishable, and in any event the portion Plaintiff cites concerned a different requirement of Rule 15(c)(1)(C), that the new party "received such notice of the action that it will not be prejudiced in defending on the merits." *See Ward*, 250 F.R.D. at 167, 168–69 (quoting Fed. R. Civ. P. 15(c)(1)(C)(i)).

it again." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)

(quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir.), *cert. denied*, 377 U.S. 934 (1964));

*Bergerson v. N.Y. State Off. of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 288 (2d

Cir. 2011). So courts ordinarily will not revisit "prior rulings in subsequent stages of the same

case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law,

the availability of new evidence, or the need to correct a clear error or prevent manifest

injustice.'" *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (quoting *United States v. Tenzer*,

213 F.3d 34, 39 (2d Cir. 2000)); *Bergerson*, 652 F.3d at 288–89.

Law of the case may apply "notwithstanding a 'difference in parties,' provided that doing

so would be consistent with the court's 'good sense'" and the considerations underlying the

doctrine. *Sec. & Exch. Comm'n v. Penn*, No. 14-CV-0581, 2020 WL 1272285, at *3, 2020 U.S.

Dist. LEXIS 46440, at *8 (S.D.N.Y. Mar. 17, 2020) (quoting *Zdanok*, 327 F.2d at 953); *see also*

*United States v. Halkbank*, No. 15 Cr. 867, 2020 WL 4932772, at *6, 10, 2020 U.S. Dist. LEXIS

153036, at *14–15, 27–28 (S.D.N.Y. Aug. 24, 2020) (same). Those "considerations" are

"fairness to the parties, judicial economy, and the societal interest in finality." *Penn*, 2020 WL

1272285, at *3, 2020 U.S. Dist. LEXIS 46440, at *8 (quoting *Cnty. of Suffolk v. Stone &*

*Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997)).

Here, Magistrate Judge Lovric previously determined that, for summary judgment

purposes, there existed "an issue of fact as to the availability of administrative remedies under"

*Williams v. Correction Officer Priatno*, 829 F.3d 118, 124 (2d Cir. 2016). (Dkt. No. 88, at 12–

16). So he recommended denying summary judgment on exhaustion grounds, "without prejudice

and with the opportunity to renew by way of an exhaustion hearing." (*Id.* at 16). The Court

34

adopted that recommendation. (Dkt. No. 89, at 2). Thus, it is law of that case that issues of fact preclude summary judgment on exhaustion.[17] *See Callahan*, 96 F.4th at 367 n.6.

Bell presents no "cogent" or "compelling" reason to revisit that ruling. *Ali*, 529 F.3d at 490 (quoting *Tenzer*, 213 F.3d at 39). Each of the legal and factual arguments he now makes could have been pressed by defense counsel before Magistrate Judge Lovric. None stem from any change of controlling law. Nor are any based on evidence that "could not have reasonably been developed and presented in earlier stages of this litigation." *See Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1005 (8th Cir. 2010). And in any event, the evidence to which Bell now points "does not undermine" Magistrate Judge Lovric's previous conclusion. *Tenzer*, 213 F.3d at 41. That evidence—namely, Plaintiff's prior and subsequent "history" with the "IGP process," his 2019 deposition testimony, and the Clinton IGP supervisor's deposition testimony,[18] (*see* Dkt. No. 201-2, at 16–19)—merely deepens, but does not resolve, the factual dispute of whether Clinton's grievance process, including the procedure for appealing "unfiled and unanswered" grievances, was unavailable to Plaintiff under *Williams*. (*See* Dkt. No. 88, at 15); *Jeffreys*, 426 F.3d at 553 (courts cannot weigh evidence or choose between conflicting versions of events on summary judgment). There is no basis to depart from the law of the case.

---

[17] To be sure, the law of the case "rule is somewhat different after a case has gone up on appeal"—where the district court's "decisions have been ruled on by" the court of appeals, it is the latter court's (explicit and implicit) "decision[s] that [are] law of the case." *See Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 378 (S.D.N.Y. 2009); *cf. Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010). But when a district court's "decisions were not ruled on by the higher court, the [district] court's decision remains the law of the case." *Am. Hotel Int'l Grp.*, 611 F. Supp. 2d at 378. Here, as discussed further below, the CORC Defendants explicitly disavowed any challenge to Magistrate Judge Lovric's exhaustion decision on appeal, so the Circuit's mandate did not rule on that issue, and that decision remains law of the case. *See id.*

[18] The Court notes that the record provides no basis to conclude that Plaintiff was aware of the relevant information from the IGP supervisor's testimony; she also testified that Clinton gave prisoners a single IGP orientation that did not include information on how to appeal an unanswered grievance. (*See* Dkt. No. 201-13, at 203–04). Although DOCCS regulations did state that "matters not decided [by prison staff] within the [regulations'] time limits [could] be appealed to the next step," the regulations provided no further instruction on how to appeal under those circumstances; the forms ordinarily required for appeal were attached to decisions rendered by the IGRC or superintendent. (*See* Dkt. No. 201-22, at 10, 13; *see also* Dkt. No. 213-30, at 2).

Under these circumstances, applying the law of the case rule to Bell is appropriate "notwithstanding [the] 'difference in parties.'" *Penn*, 2020 WL 1272285, at *3, 2020 U.S. Dist. LEXIS 46440, at *8 (citing *Zdanok*, 327 F.2d at 953). Bell's briefing presents no argument specifically addressing Plaintiff's law of the case arguments as to exhaustion. (*See* Dkt. No. 224-6, at 5–9). Had Bell been added as a defendant in 2018—as the spirit of the mandate reflects he should have been—he would have been party to the action at the time of the original summary judgment motion. The state attorney general's office may well have represented him, and the exhaustion defense involved no factual or legal issues specific to Bell. So he would have been left in the same position as each CORC Defendant following Magistrate Judge Lovric's exhaustion ruling. Moreover, allowing another opportunity to litigate the grievance process's availability at the summary judgment stage—years after Magistrate Judge Lovric's ruling that no party challenged on appeal—would be inconsistent with finality principles and risk wasting judicial resources.[19]

In the alternative, Bell requests an exhaustion hearing. (Dkt. No. 224-6, at 8–9). Plaintiff opposes this request. (Dkt. No. 212, at 26). Magistrate Judge Lovric specifically recommended that the Court deny summary judgment without prejudice to a request for an exhaustion hearing. (Dkt. No. 88, at 16). The factual dispute concerning availability must be resolved by a factfinder, and Plaintiff has no "right to a jury trial on factual disputes regarding [his] failure to exhaust administrative remedies." *Messa v. Goord*, 652 F.3d 305, 308 (2d Cir. 2011) (per curiam). As explained below, Bell is not entitled to summary judgment on the merits of Plaintiff's Eighth Amendment claim, so the Court will hold an exhaustion hearing.

---

[19] Even without Magistrate Judge Lovric's prior ruling, the Court would deny summary judgment on exhaustion grounds in light of the factual dispute identified above concerning the Clinton grievance process's availability.

### c. Deliberate Indifference

The Eighth Amendment, applicable to the states through the Fourteenth Amendment, proscribes cruel and unusual punishment. *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 101 (1976). "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). A prisoner may therefore "state[] a cause of action under the Eighth Amendment by alleging that defendants have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health." *Warren v. Keane*, 196 F.3d 330, 332–33 (2d Cir. 1999) (alteration adopted) (quoting *Helling*, 509 U.S. at 35); *see also Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).

A plaintiff must demonstrate "both the objective and subjective components of [an] Eighth Amendment violation." *Davis*, 316 F.3d at 100 (citing *Helling*, 509 U.S. at 35). Bell does not contest the objective component for summary judgment purposes. (*See* Dkt. No. 201-2, at 25 n.7). The subjective component requires a sufficient showing of "deliberate indifference." *Warren*, 196 F.3d at 333 (citing *Helling*, 509 U.S. at 36). Deliberate indifference "means the official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Tangreti*, 983 F.3d at 619 (cleaned up); *see also Farmer*, 511 U.S. at 837. Additionally, "a defendant cannot have disregarded a serious risk to a plaintiff, of which he was aware," unless he possessed "the ability to take some action to alleviate that risk." *Suarez v. Morton*, 170 F.4th 33, 61 (2d Cir. 2026).

Here, there exists a genuine dispute of material fact as to Bell's deliberate indifference, so Plaintiff's claim against him survives summary judgment. As an initial matter, Bell does not

dispute that as superintendent he had authority "to take some action to alleviate [the] risk" of ETS exposure by enforcing the DOCCS non-smoking policy. *Id.*; (*see* Dkt. No. 201-35, ¶ 4).

As to the remaining deliberate indifference requirements, Plaintiff has adduced sufficient evidence for a reasonable jury to conclude that Bell was "aware of facts from which" he could infer "that a substantial risk of harm" due to excessive ETS exposure existed. *Farmer*, 511 U.S. at 837. Both Plaintiff and DePerno testified that incarcerated individuals at Clinton "smoke[d] constantly"; they also stated that Clinton staff inadequately enforced the non-smoking policy. (Dkt. No. 201-4, at 31–34, 44–53, 134; Dkt. No. 201-5, at 152–54; Dkt. No. 201-17, at 10–14, 21–22). And one of Plaintiff's experts concluded that DOCCS "commissary sales and package policy provide[d] [incarcerated] smokers with access to more [cigarettes] than they could be expected to smoke during [their] limited outdoor time." (*See* Dkt. No. 213-35, at 12–13). Specifically, that expert concluded that "Clinton's commissary records suggest inmates purchased the equivalent of an average of 2,108,513 cigarettes per year, and an additional 10,440 cigars or cigarillos." (*Id.* at 12, 28 (citing Dkt. No. 201-15, at 19)).

As superintendent, Bell would patrol Clinton's cell blocks. (Dkt. No. 201-35, ¶ 4; *see also* Dkt. No. 201-11, at 106). A jury crediting Plaintiff's and DePerno's testimony that prisoners constantly smoked could reasonably infer that Bell must have witnessed the smoking during his patrols. Indeed, Bell admits that he observed prisoners smoking, though he says it "was not a significant issue." (*See* Dkt. No. 201-35, ¶¶ 15–16; Dkt. No. 201-11, at 106–07). He also recalled smelling tobacco smoke "a few times" during patrols. (Dkt. No. 201-11, at 108–09). And Plaintiff testified that he "mentioned [the ETS exposure] to [Bell] a few times."[20] (Dkt. No. 201-

---

[20] Additionally, Bell was copied on a 2017 email that proposed a solution to "the never-ending problem of inmates['] inappropriate use of lighters," which would "prevent[] inmates from smoking indoors." (Dkt. No. 213-38, at 2). He was also aware of the prisoners' "out of control" smoking within the Clinton annex in 2019. (Dkt. No. 213-40, at 3; *see also* Dkt. No. 201-35, ¶ 17; Dkt. No. 213-41, at 2).

5, at 144). To be sure, Bell has submitted a rebuttal expert report challenging Plaintiff's expert. (*See* Dkt. No. 224-2). And he and others tell a different story about smoking at Clinton. But a factfinder must resolve that factual dispute. The Court cannot do so on summary judgment. *See Jeffreys*, 426 F.3d at 553.

A jury could further reasonably conclude that Bell, aware of Clinton prisoners' exposure to ETS, actually "dr[e]w the inference" that it posed "a substantial risk of serious harm" but failed to act. *Farmer*, 511 U.S. at 837. The health risks associated with excessive ETS exposure have long been common knowledge. *Cf. Warren*, 196 F.3d at 333 (denying qualified immunity on prisoner ETS claim following *Helling*). Bell himself suffers from asthma and notes that he is "disproportionately affected by tobacco smoke." (Dkt. No. 201-35, ¶ 14). Yet, Plaintiff and DePerno say, the excessive ETS exposure endured. (*See* Dkt. No. 201-4, at 48–49, 51–52; Dkt. No. 201-17, at 11–12). Bell points to other evidence that he says reflects efforts to enforce the non-smoking policy at Clinton, even if "imperfectly." (*See* Dkt. No. 201-2, at 26–29; Dkt. No. 224-6, at 12–13). But again, the Court cannot resolve these "conflicting versions of the events" now. *Jeffreys*, 426 F.3d at 553 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

Construing the record in the light most favorable to Plaintiff, a jury could reasonably infer that Bell was aware of Clinton prisoners' exposure to excessive ETS, knew such exposure posed "a substantial risk of serious harm," and "disregard[ed]" that risk. *Farmer*, 511 U.S. at 837. Accordingly, the Court denies summary judgment as to Bell.[21]

---

[21] Bell also invokes qualified immunity. (Dkt. No. 201-2, at 29–30). But accepting Plaintiff's version of events—that Bell was aware of constant, pervasive ETS exposure at Clinton, but failed to take sufficient action to curb that exposure—a jury could reasonably conclude that Bell exhibited "deliberate indifference to [Plaintiff's] exposure to levels of ETS that posed an unreasonable risk of future harm to [Plaintiff's] health." *Warren*, 196 F.3d at 333. It has long been "clearly established that prison officials could violate the Eighth Amendment through" such conduct. *Id.*; *see also Helling*, 509 U.S. at 35. So the factual dispute described above also precludes the Court from determining whether Bell violated a clearly established right, *see Warren*, 196 F.3d at 333, or whether "it was objectively reasonable for him to believe that his acts did not violate" that right, *Clark v. Valletta*, 157 F.4th 201, 216 (2d Cir. 2025) (quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018)); *see Jeffreys*, 426 F.3d at 553.

### 2.    CORC Defendants

#### a.    Exhaustion

The CORC Defendants, too, assert that Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 201-2, at 14–19). But they failed to object to Magistrate Judge Lovric's report-recommendation addressing exhaustion—despite being told that their failure to do so within fourteen days would "preclude appellate review," (Dkt. No. 88, at 31 (emphasis omitted))—and the Court adopted it, (Dkt. No. 89, at 2). They never previously requested an exhaustion hearing, and on appeal did not contest Magistrate Judge Lovric's conclusion, conceding that they had "waived any such challenge by not objecting to the [report-recommendation] finding a question of fact on [their] exhaustion defense." (Dkt. No. 213-14, at 32). Only now do the CORC Defendants assert that they are entitled to summary judgment on exhaustion and request an exhaustion hearing.

Under these circumstances, the Court concludes that the CORC Defendants cannot reassert their exhaustion defense on summary judgment. *See Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 362 (2d Cir. 2025) ("Where parties receive clear notice of the consequences, failure to timely object to a [report-recommendation] forfeits further judicial review of the magistrate judge's decision."); *see also Saab*, 164 F.4th at 213. As with Bell, the Court would ordinarily next consider whether to hold an exhaustion hearing as to these claims. But it need not do so here. Even assuming Clinton's grievance process was unavailable to Plaintiff, the CORC Defendants are entitled to summary judgment on the merits of his Eighth Amendment claims.

#### b.    Personal Involvement

The CORC Defendants principally argue that Plaintiff has failed to show a genuine dispute of fact as to their personal involvement. (*See* Dkt. No. 201-2, at 19–24). Plaintiff disagrees. (Dkt. No. 212, at 28–32). The "personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, plaintiffs must "prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676); *see also Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023) (per curiam). As explained above, to satisfy the Eighth Amendment's subjective component, a plaintiff must show that "the official [was] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that the official] dr[e]w the inference." *Tangreti*, 983 F.3d at 619; *see also Farmer*, 511 U.S. at 837. So here, for Plaintiff's remaining claims to survive summary judgment, there must exist—for each CORC defendant—a genuine factual dispute as to whether each "personally knew of and disregarded an excessive risk to [Plaintiff's] health or safety" from ETS exposure at Clinton. *Tangreti*, 983 F.3d at 619; *see also Suarez*, 170 F.4th at 59–60.

For the reasons explained above, the Court will not permit the CORC Defendants to argue that they were not personally involved by reason of their delegating CORC duties. Even so, there is insufficient evidence to create genuine issues of fact as to whether each personally exhibited deliberate indifference to Plaintiff's ETS exposure at Clinton.

As an initial matter, each CORC Defendant testified that they do not recall personally reviewing Plaintiff's letters. (*See* Dkt. No. 201-6, at 128–29; Dkt. No. 201-7, at 138–39; Dkt. No. 201-8, at 146–47; Dkt. No. 201-9, at 72; Dkt. No. 201-10, at 37). All now aver that they never "investigate[d]" or "respond[ed]" to any such letters—except for Koenigsmann, who avers that he does not recall doing so—and none recall "becoming aware of the subject matter of the complaints alleged in this lawsuit prior to being apprised of the existence of this litigation." (Dkt.

41

No. 201-29, ¶ 10; Dkt. No. 201-30, ¶ 9; Dkt. No. 201-31, ¶ 16; Dkt. No. 201-32, ¶ 9; Dkt. No. 201-33, ¶ 9). Additionally, Bellnier and Koenigsmann state that they would not review "[u]nsolicited grievances." (Dkt. No. 201-29, ¶ 11; Dkt. No. 201-31, ¶ 12).

Plaintiff contends that, because he has submitted evidence that he mailed properly addressed letters to each CORC Defendant, he is "entitled to a presumption that his letters were read by the CORC Defendants." (Dkt. No. 212, at 29). That presumption, he says, taken together with these Defendants' status as CORC members—and the fact that, on at least one occasion, a letter outside the grievance process prompted Bellnier to take action concerning the non-smoking policy at Livingston—is sufficient for these claims to survive. (*See id.* at 29–31).

The Second Circuit has held that, where a party provides evidence that a mailing was "properly addressed and mailed in accordance with regular office procedures, [that party] is entitled to a presumption that the [mailing was] received." *Akey v. Clinton Cnty.*, 375 F.3d 231, 235 (2d Cir. 2004); *see also Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 92 (2d Cir. 2010). "Mere denial of receipt is insufficient to rebut the presumption." *Ma*, 597 F.3d at 92; *Davis v. Goldstein*, 563 F. App'x 800, 803 (2d Cir. 2014). Assuming that principle applies here, *see Outman v. Waldron*, No. 9:14-CV-0540, 2016 WL 1175235, at *1, 2016 U.S. Dist. LEXIS 38867, at *2 (N.D.N.Y. Mar. 24, 2016), Plaintiff has provided sufficient evidence that he mailed properly addressed letters to each CORC Defendant. (*See* Dkt. No. 213-9, at 2–4; *see also* Dkt. Nos. 213-10, 213-11, 213-12, 213-13). And, as noted above, those defendants have not averred that they did not receive the letters, only that they do not recall reviewing them.

But on the facts of this case, the Court cannot conclude that the presumption of receipt is enough to establish a genuine dispute of fact concerning personal involvement. The CORC Defendants, all high-level DOCCS officials, stated that none personally sorted or reviewed the

42

large volume of mail sent to their offices, instead having staff perform that duty. (*See* Dkt. No. 201-6, at 55–58; Dkt. No. 201-7, at 24, 127–29, 132–33; Dkt. No. 201-8, at 40–41, 144–45; Dkt. No. 201-9, at 64–65; Dkt. No. 201-10, at 33–36; *see also* Dkt. No. 201-31, ¶ 6). Koenigsmann and Martuscello testified that Plaintiff's letter looked like mail their office staff would have forwarded without involving them. (*See* Dkt. No. 201-8, at 147–48; Dkt. No. 201-10, at 37–38). So even presuming that the CORC Defendants' offices received Plaintiff's letters, no factfinder could reasonably infer "that each Government-official defendant" themselves therefore read the letters, such that they "personally knew of and disregarded an excessive risk to [Plaintiff's] health or safety" from ETS exposure. *Tangreti*, 983 F.3d at 618–19 (quoting *Iqbal*, 556 U.S. at 676); *cf. Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (no personal involvement of commissioner where he referred prisoner's letter to subordinate and personally responded to later status request by explaining that subordinate had made a determination regarding the letter).

Indeed, the Second Circuit has explained that, at the *pleading stage*, a plaintiff who alleges that he sent a letter describing unconstitutional conditions to a prison official is "entitled to have the court draw the reasonable inference . . . that the [official] in fact received the [l]etter, read it, and thereby became aware of the alleged conditions of which [the plaintiff] complained." *See Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013). But it emphasized that "[p]ersonal involvement is a question of fact" requiring "development of [the] record" before dismissal. *Id.* at 140–41 (quoting *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986)). One factual issue relevant to that analysis is whether "an administrative procedure was in place by which the [official] himself would not have received the [l]etter addressed to him." *See id.* at 141. As detailed above, there exists evidence of precisely such a procedure here and no evidence reflecting that any CORC Defendant otherwise read Plaintiff's letters.

To be sure, Bellnier testified that if a prisoner's grievance or "complaint ultimately wound up on [his] desk"—which was "quite possible," though he could not "say for certain" how often—he "would review it," sometimes "even if [it] came to [him] outside of the formal grievance process." (Dkt. No. 201-7, at 127–29, 131). But, he also said, that a prisoner sent a complaint to his office "didn't mean that [it] ultimately came to" him; "the volume was such that [he] couldn't spend all day just responding to inmate complaints." (*Id.* at 128). Further, as noted above, he avers that would not have reviewed "[u]nsolicited grievances from incarcerated individuals." (Dkt. No. 201-29, ¶ 11). Likewise, McKoy testified that his role included responding to program services grievances that "end[ed] up on [his] desk" by "forward[ing] [them] down to staff to look into"; if a letter "came to [him] for a response," he would either "respond or . . . refer it to someone else to respond on [his] behalf." (Dkt. No. 201-9, at 16–17, 24–26). He further explained that sometimes his mail would "come[] to [him] directly," or other times to his office for referral. (*Id.* at 65–67). But even as to mail that reached his desk, McKoy would not personally open and read letters, instead enlisting his "assistant and directors to help" screen and refer.[22] (*See id.*). This testimony, without more, would not permit a reasonable factfinder to infer that Bellnier or McKoy actually read Plaintiff's letters and failed to act, exhibiting deliberate indifference. *See Tangreti*, 983 F.3d at 619; *Sealey*, 116 F.3d at 51.

Plaintiff next asserts that the "CORC Defendants were made aware through the CORC appeals process of facility-wide problems, which they were charged with rectifying as supervisory officials responsible for the implementation and enforcement of policies." (Dkt. No.

---

[22] Moreover, McKoy was the deputy commissioner for program services, overseeing "the programs and services offered to incarcerated individuals," such as educational, guidance and counseling, religious, and other services. (Dkt. No. 201-33, ¶¶ 1, 4; *see also* Dkt. No. 201-9, at 12–13). There is no record evidence that—unless the matter presented itself via a proper CORC appeal (putting aside the designee issue)—he would have had "the ability to take some action to alleviate [the] risk" from ETS, a concern outside his deputy commissioner authority. *See Suarez*, 170 F.4th at 61.

212, at 30). However, Plaintiff did not follow the DOCCS regulations governing an appeal to CORC. So no reasonable juror could infer that his ETS complaints reached the CORC Defendants (or their designees) via the ordinary appeal process.[23] (*See* Dkt. No. 201-52, at 1–2; Dkt. No. 201-51, ¶ 16). Nor does the record establish that any CORC Defendant, or their designees, would have had the authority—by virtue of their CORC membership—to act on matters not raised through that appeal process. *See Suarez*, 170 F.4th at 61.

Although record evidence reflects that CORC received appeals from other prisoners on ETS exposure during the relevant time frame, none came from Clinton. (*See* Dkt. No. 201-25, at 1–2). No jury could reasonably infer that the CORC Defendants' or their designees' knowledge "of facility-wide [ETS exposure] problems" at other facilities through those appeals meant they knew of ETS concerns at Clinton. (Dkt. No. 212, at 30). DePerno did not appeal his Clinton ETS grievance to CORC. (*See* Dkt. No. 201-25, at 1–2; *see also* Dkt. No. 201-17, at 32–34). So the record contains no basis to conclude that the CORC Defendants were made aware of a risk to Plaintiff's health and safety at Clinton through the grievance appeal process. *See Tangreti*, 983 F.3d at 619.

Finally, Plaintiff highlights Bellnier's and Koenigsmann's unique responsibilities as deputy commissioners, as well as prior action Bellnier took in response to ETS exposure at Livingston, and his admission that it was "probably true that [prisoners were] smoking tobacco . . . wherever they [got] the chance." (Dkt. No. 212, at 31–32 (quoting Dkt. No. 201-7, at 70)). But that evidence creates no genuine factual dispute as to whether the two were themselves

---

[23] To be sure, Plaintiff testified that he received no response to his facility-level grievances. (*See* Dkt. No. 201-4, at 83–84, 96). But that does not change the fact that neither the CORC Defendants nor their designees could have learned of Clinton ETS conditions through the CORC appeal process.

subjectively aware of the excessive ETS exposure at Clinton. *See Tangreti*, 983 F.3d at 619.

Accordingly, the Court grants summary judgment as to the CORC Defendants.

## V.      CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for sanctions (Dkt. No. 210) is **GRANTED in part** and **DENIED in part** as set forth above, and Defendants Bruen, McKoy, Bellnier, Martuscello, and Koenigsmann are directed to pay reasonable attorney's fees and costs in connection with that motion; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 201) is **GRANTED in part** and **DENIED in part** as set forth above; and it is further

**ORDERED** that each of Plaintiff's claims, except for the Eighth Amendment deliberate indifference claim against Bell, are **DISMISSED with prejudice**, and the Clerk is respectfully directed to terminate each remaining Defendant except Bell; and it is further

**ORDERED** that Plaintiff's counsel shall submit their request for fees and costs in connection with the sanctions motion by Tuesday, May 19, 2026, with any response due by Tuesday, June 2, 2026; and it is further

**ORDERED** that the Court will hold an evidentiary exhaustion hearing on Friday, May 22, 2026 at 10:00 a.m., and the parties' exhibit and witness lists are due by Friday, May 15, 2026.

**IT IS SO ORDERED.**

Dated: <u>April 28, 2026</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

46